## UNGER'S APPEAL.

Where a man agreed to furnish a clerk in a store and receive half the
profits, and gets his son to act as the clerk, upon a failure and assigment,
the son cannot claim wages out of the assigned estate.

Appeal from Common Pleas of Berks County.   No. 284
January Term, 1880.

John S. Kershner and one Reinhart were engaged in keeping
store in Shoemakersville, Berks County, and were occupying
the store room in the hotel building of Samuel Unger.   In the
Spring of 1875 the partnership was dissolved and the business
thereafter conducted by Kershner until the 7th of May, 1877,
when he made an assignment for the benefit. of creditors to.
Samuel Hoffman and Amos B. Wanner.   Alue F. Unger, the:
appellant, then about 24 years of age, was boarding with his.
father, Samuel S. Unger, who was conducting the hotel.   A
clerk being needed, young Unger did the clerking during the
two days occupied in the appraisement, and as Kershner had
no clerk, Unger continued to act as clerk in the store, often.
having sole charge, without further engagement on contract
down to the time of Kershner's assignment in May, 1877.
So far as the testimony discloses, he appears to have attended
to his duties faithfully and to the entire satisfaction of Kersh-
ner, who permitted him to take money and goods out of the:

store as he needed them, on account of his services—he charging himself with them in the back part of the blotter, where Kershner also kept a private account. Nothing was ever said by Kershner to him in reference to the charges, which footed up about $230, during the whole period of service. After the assignment the assignees kept the store open about a month, during which time young Unger continued to conduct the business without any special bargain, and subsequently presented his claim to the assignees for services, at the rate of $40 a month, for a period of 25 months, less the amount charged against him in the books—the net claim being $720. Of this sum $40 was claimed for services to the assignees, $200 as preferred wages and a dividend on the balance of $480.

That the services were rendered as claimed, and that they were worth $40 a month, the claimant paying his own board, was not disputed, but the claim was objected to on the ground that Samuel S. Unger, the father of the appellant, was a secret partner of Kershner's, and that as one of the conditions of the partnership, he had engaged to furnish a hand in the store; that the claimant was the hand; and that as there was no profit in the business, he could recover no wages for his services.

The auditor's report, so far as it related to A. F. Unger's claim, was as follows:

With respect to this claim two questions were presented, viz:

1. Whether Kershner is liable to pay claimant for the time he was attending the store as a clerk.

2. What preference is to be given to the wages of a clerk.

The first question, whether Kershner is liable to pay claimant for the time he was attending the store as clerk, resolves itself into the simple question, *whether there was a partnership existing between* Samuel S. Unger, the father of the claimant, and John S. Kershner and whether this claimant was not attending in the interest of his father. If such is the case, it will not be necessary for the auditor to consider the second question presented. Justice Sharswood says in Irwin vs. Bidwell, 22 P. F. Smith, 224, "There are three classes of cases in which parties may become liable to other persons as partners:

1st. When they are actually partners *inter se* by express agreement.

2d. When not being partners *inter se*, or entitled to any share of the profits, they hold themselves out to the world as such by acts or declarations, and the particular creditor who sues treats them as partners on the faith of such acts or declarations.

3d. When there is an agreement to receive a share of the profit as such, and not a mere commission on profits or a sum equal to a certain share of the profits as a compensation for services.

It is clear that under the first two classes, John S. Kershner and Samuel S. Unger were not partners, and it is now only for the auditor to determine whether or not under the third class a partnership existed or can be found. Considerable testimony was taken relative to the claim. In the first case what are the facts of the case. Alue F. Unger, a son of Samuel S. Unger, who is now deceased, and whose lips are now forever closed from giving the true history of the case, presents a claim of $1,000 for two years' service in attending in the store of John S. Kershner. This claim was afterward reduced to $720, which amount your auditor is asked to allow. *It is not denied that the claimant actually rendered the services for which he asks compensation.* Thus far there is no variance between the statements of the parties. The claimant further testifies as follows: "I had no contract for compensation; I got from time to time articles and money out of the store as I needed them, and charged myself in the book with what I got; I am charged with between $200 or $300; the books will show how much." In cross examination he further says: "No contract was at all between myself and Kershner; I never spoke to Kershner what I was to have or to get; not a word; did not know while I was there that my wages were to depend upon the profits of the store." The only evidence as to his employment is, that when Kershner had bought out Reinhart, a former partner, and they were making an appraisement of the goods, Kershner came up to Unger (the claimant) in the bar-room and told him to come and clerk, "and from that time," he says, "I clerked on without making any contract or saying anything about it." It seems very strange, indeed, that a young man of such business qualifications, more than ordinary intelligence, should upon such a simple, plain request, render services

to another for the term of two years and make no claim for wages, never speaking a word about it, nor concerning himself in any way how, what or when he should be paid, never presenting his claim until the auditor is about to make up his report. Such is the nature of the evidence of this claimant. On the other hand Mr. Kershner, the assignor, says *that he did not say to claimant, when they were taking the appraisement, that he should come over and clerk for him. Repeatedly he testifies that he did not order him there ; that he never employed him ;* that he never liked him ; never had any bargain or contract with him nor that he was ever asked about any wages, corroborating in chief the claimant. In the absence of an express promise, the law presumes the undertaking to have been made, and it could be only on the ground of an implied assumpsit that this claimant could ever recover. *The intention of a party to any transaction can be gathered from his acts in connection with the surrounding circumstances,* and it is *from the silent language of men's conduct and actions* that the law implies contracts and promises as forcible and binding as those that are made by express words. Thus it will be for the auditor *to examine carefully the situation, conduct and relation of these parties to each other, together with all the surrounding circumstances and see whether an implied contract can be legally inferred to exist between the parties.* The only grounds on which it is contended that an implied assumpsit exists is, *First,* that Kershner acquiesced in the services, and, *Secondly,* That he acquiesced in the claim, and from time to time taking money and goods from the store. The first proposition is explained by setting up the *partnership between Kershner and Unger, the father of the claimant, and that the claimant acted in place of the father.* Kershner testifies that "the bargain was that Samuel Unger was to have one-half of the profits, and then he was to furnish one hand. His son, Alue, was to attend the same way that I did," and then goes on to say that he never employed him, &c., &c. "This was a a secret understanding between the parties and not known to any one. Was not intended to be made public." In corroboration of this evidence several witnesses are called who seem to know nothing about it, except Aaron Kershner, who says: "I had a conversation once with Al. Unger about his attending

in the store. I asked him about it. He said they were the next thing to partners, or something like that; said nothing about services or wages." Geo. Unger says: "*He* (meaning his father) never told me as to being a partner, but said he was to have a share, half of the profits, by way of rent, for payment of rent." In further corroboration, Amos B. Wanner, Esq., is called, who testified: "In the evening, about the close of the sale, Mr. S. S. Unger told me that he had an interest in the store, and that his son, Alue F. Unger, was attending in the store in his interest; that he did not know whether he (meaning Alue) was getting anything or not; that therefore he had rented the store for $100, and that he would not do it any longer, and insisted upon having $200. This conversation took place after the insolvency of S. S. Unger, and seems to be the keynote of the entire transaction. Why an increase of rent and no more partnership if Samuel S. Unger had no interest in this store? If the room was worth $200 a year rent at that time, was it not worth the same, or even more, two years prior, when business and trade were better and real estate had not depreciated so much in value? *Can we not conclude that the difference between the rent was a sufficient inducement for a partnership between the parties compared with the amount of capital invested?* It is a well settled principle that an agreement whereby persons are entitled to an equal share in the profits of a business for which money is supplied by one only constitutes a partnership; Gregg Township vs. Half Moon Township, 2 Watts, 312; Purviance vs. McClintee, 6 S. & R., 259; Ditsche vs. Becker, 6 Phila., 176; Hoffer's Estate, 3 Brewster, 164. In Purviance vs. McClintee *supra* Ch. J. Tilghman says: "If it be agreed that A should furnish all the stock and B contribute his services, in consideration whereof he shall be entitled to one-half of the profits without being subject to any part of the loss. It is all very fair and very well between A and B, but to the world, who have no means of knowing the secret agreement of parties, such a condition is not to be permitted. The partnership creditors trust to the partnership stock, and therefore no man shall be allowed to lessen the stock by taking part of the profits without incurring the responsibility of a partner. The law was so laid down

in Grace vs. Smith, 2 W. Black. 998. "Every man," says Ch. J. Dr. Gray, "who has a share of the profits of a trade ought also to bear a share of the loss, and if any one take of the profits he takes part of that fund on which the creditor of the trade relies for his payment." The same principle was expressed by C. J. Eyre in Waugh vs. Carver, 2 H. Black, 235, citing and relying on Grace vs. Smith, *supra*. In the present state of this world, we cannot afford to part with any of the safeguards against frauds. It is impossible to know the secrets of merchants. It is of importance that creditors should not be deprived of that fund to which they looked for payment and to which they had a right to look, as it was a visible sign held out to them by which they were to judge the amount of the partnership property. Every man who trusts the partnership increases that fund upon the faith of its being applied in the first instance to pay the partnership debts, and therefore no man shall be suffered to diminish it upon pretence of taking part of the profit as a compensation for his services, without being himself responsible in case of loss. If he was to take half of the profits, he was, by operation of the law, a partner." The opinion answers the point of the learned counsel relative to there being no agreement as to losses. *In the face of such authorities as above cited, and considering the evidence before your auditor, together with all the surrounding circumstances, and the acts of the parties, the long silence of the claimant* as to any demand for compensation, there is no question in the mind of the Auditor *that there was a secret partnership between the parties, and further finds the fact.*

As to the second point, that Kershner acquiesced in the claimant taking from time to time money and goods from the store. This is explained on the part of the assignor very forcibly as follows: "I let him take them because I thought the profits would be more than he would take out. I thought half the profits would be more. I thought it would make no difference whether it went to Sam Unger or his son." These charges of the claimant were made in the back part of the blotter, the same place where Kershner also kept his private account. The principle as laid down in Neal vs. Gilmore, 79 Penn St. R., 421, and cases there cited that nothing is better settled than

that *while the performance of labor for one by another raises an
implied assumpsit to compensate it, yet, this implication may be
rebutted by proof of circumstances showing such a relation between
the parties as repel the idea of contract.* Although in that case
the parties were relatives of the deceased, yet in this case the
claimant is a son of the partner, who enters the store in his
father's behalf and interest as his father's representative or
agent. *In accordance with the foregoing views the auditor cannot
allow the claim,* and sustains the objections as made on the part
of the creditors.

The Common Pleas overruled exceptions and confirmed the
report. Unger then appealed.

*A. G. Green, Esq.,* for appellant, argued that where an
Auditor's conclusion is a deduction from other facts, it is sub-
ject to revision and correction; Philipps' Appeal, 68 Pa., 130;
Hindman's Appeal, 85 Pa., 466. He also argued that if there
had been a partnership it had been dissolved and after that
Unger was entitled to compensation.

*Richmond L. Jones, Esq., contra.*

The Supreme Court affirmed the decree of the Common
Pleas on March 14th, 1881, in the following opinion:

PER CURIAM.

In the conclusions drawn by the learned auditor confirmed
by the approval of the learned Court, we cannot see any such
flagrant and palpable mistake as would justify us in accord-
ance with established principles in setting aside the report and
reversing the decree.

Decree affirmed and appeal dismissed at the costs
of the appellant.